UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JONATHAN E ACKERMAN,<br><br>              Petitioner,<br><br>   v.<br><br>MIKE OBENLAND,<br><br>             Respondent. | CASE NO. 3:21-cv-05110-JCC-DWC<br><br>REPORT AND RECOMMENDATION<br><br>Noting Date: September 10, 2021 |

The District Court has referred this action to United States Magistrate Judge David W. Christel. Petitioner, proceeding *pro se*, brings this habeas corpus proceeding pursuant to 28 U.S.C. § 2254. For the reasons set forth below, the district judge should deny the Petition for Writ of Habeas Corpus (Dkt. 3) and dismiss this case with prejudice.

**I.**     **Background**

    A.   <u>Factual Background</u>

Petitioner is in custody under a state court judgment and sentence imposed for his conviction by guilty plea on one count of murder in the second degree. Dkt. 9-1 at 2-12.

REPORT AND RECOMMENDATION - 1

Petitioner was also convicted of identity theft and attempted theft of a motor vehicle, though he does not challenge those convictions in this action. *See* Dkt. 3; Dkt. 9-1 at 14-24.

The Washington Court of Appeals summarized the facts of Petitioner's case as follows:

> On October 20, 2016, a citizen found the body of 18-year-old Dakota Walker near a campground. Law enforcement identified Ackerman as a person of interest. According to a later-filed probable cause statement, Ackerman had been in a relationship with Walker, and Walker was the "'submissive'" or "'slave'" in the relationship. Witnesses reported that Ackerman "exercised a great deal of power and control over [Walker], including controlling his telephone privileges and his ability to have external conversations with his friends."
>
> According to the probable cause statement, a witness told law enforcement that Ackerman told her he had been in prison with a man named Vincent Garlock and that they "protected each other." The witness stated that Ackerman and Garlock "were almost always together." Law enforcement contacted and interviewed Garlock, who stated that he, Ackerman, and Walker would drive around Thurston County at night, stealing mail from mailboxes. Garlock "described the relationship between [Ackerman] and [Walker] as 'tumultuous.'" According to the probable cause statement, Garlock said "[Ackerman] had told him he saw [Walker]'s phone where [Walker] had been 'taking notes' and writing down personal information on [Ackerman]." Garlock said that "[Ackerman] expressed his concern [that Walker] was going to call the police on him."
>
> According to the probable cause statement, when asked when he last saw Walker, Garlock said that he, Ackerman, and Walker were in a van during the late night or early morning hours of October 19 or 20, 2016, when at some point Garlock fell asleep. Garlock recalled that he was awakened by a single gunshot and saw Ackerman in the driver's seat but did not see Walker. Garlock stated that Ackerman exited the van, and then Garlock heard six more gunshots. Ackerman returned to the van and told Garlock, "'It had to be done.'" Garlock and Ackerman then drove away.
>
> According to the probable cause statement, a witness who had been emailing with Walker on October 19, 2016, noticed a change in the vernacular of the conversation in the early evening or late afternoon. She then believed she was not communicating with Walker, but with Ackerman. Another witness provided a Facebook Messenger conversation with a person using Walker's account. In the messages, the sender asked the witness for help, saying that he had been shot and was bleeding. The witness, who had messaged with Walker before, did not think that the tone used in the conversation was consistent with Walker's. She believed that the sender was Ackerman, who had used Walker's account to message her before.

REPORT AND RECOMMENDATION - 2

Detectives later interviewed Ackerman. According to the probable cause statement, Ackerman stated that he, Walker, and Garlock were in Capitol Forest when they stopped so that Walker could go to the bathroom. Ackerman stated that "[h]e observed [Walker] on the passenger side of the vehicle urinating when Garlock shot him through an open passenger side window." When Ackerman asked Garlock why he had murdered Walker, Garlock told him, "'He knew too much.'" According to the probable cause statement, Ackerman was referring to Walker's knowing Garlock's alias.

The State charged Ackerman with murder in the first degree/domestic violence while armed with a firearm. Garlock was jointly charged under a separate cause number. The State later amended the charge against Ackerman to murder in the second degree, and Ackerman pled guilty to that charge. Based on Ackerman's offender score, the standard range for second degree murder was 195 to 295 months. In the plea agreement, the State agreed to recommend a sentence of 240 months, the approximate middle of the standard range. The State agreed that the sentence would run concurrently with Ackerman's sentence in another case (identity theft case), in which Ackerman had pled guilty to attempted theft in the first degree, attempted theft of a motor vehicle, and identity theft in the second degree. The State and Ackerman also agreed that restitution would be joint and several between Ackerman and Garlock, and that Ackerman would "forfeit all property collected as evidence (except family and other personal photographs belonging to defendant)" that were found in the van involved in the shooting. (Boldface omitted.)

The trial court held a sentencing hearing in April 2018. Before sentencing Ackerman for the murder charge, the court issued the jointly recommended sentence in the identity theft case. After turning to the sentencing in this case, the court asked the State for its recommendation. The prosecutor began by stating that "[t]he sole charge in this cause number is murder in the second degree" and that "[t]he agreed recommendation is for 240 months in prison." After outlining other aspects of the agreed sentence and asking the court to impose restitution and legal financial obligations, the prosecutor provided the court with a high-level timeline of the case. She explained that Ackerman and Garlock knew each other from prison in Pennsylvania and decided to move to Washington. She explained that while Garlock and Ackerman were in Oregon, Ackerman, who was 30 at the time, met Walker, who was 17, on an online dating app for men. The prosecutor stated that Walker had told a friend that "he wasn't really interested in a homosexual relationship but primarily was interest[ed] in getting out of the area where he was currently living." She then stated that Walker

> seemed to be a vulnerable young man. And I'll tell the court, one of the reasons I say that was just how long it took for—I mean, nobody knew that he was missing during the time that his body lay in the Capit[o]l Forest. So he was vulnerable, in that he wanted to get out.

REPORT AND RECOMMENDATION - 3

> He maybe didn't have as much connection with all of family members as you might hope for a 17-year-old young man.

The prosecutor went on to describe Ackerman and Garlock's "life of crime," in which they "supported themselves primarily by stealing mail" and took Walker with them. The prosecutor recounted Walker's friends' statements that Ackerman treated Walker "as if he owned him." She stated that "[w]hen you look at this case, it's clear that Ackerman had the motive to kill [Walker]." She stated that Ackerman had threatened Walker's friends and anyone that appeared to be helping Walker, indicating that he would kill them. She reported that "[o]ne witness even stated that Mr. Ackerman provided her a list of names and addresses for her family members," and another person close to Walker said that Ackerman "threatened her and said he would put a bullet between her eyes and shoot her when she was least expecting it." The prosecutor stated, "[T]he State believes that's what happened to [Walker], that he was shot when he was least expecting it."

The prosecutor described Ackerman as "a pretty skilled criminal" but explained that he made a "significant error" by keeping the GPS (global positioning system) running in his vehicle in the days before and after Walker's death. She explained that based on the GPS information, the State believed that Walker was murdered the morning of October 17, 2016, and that Ackerman visited the crime scene twice in the days after Walker's death. She stated that at the same time, someone was sending messages to Walker's friends, pretending to be Walker. The prosecutor concluded her remarks as follows:

> I tell all of that to Your Honor because I know the court is going to be sentencing Mr. Garlock later. Ultimately, this was a very difficult case, but the State could see that clearly Mr. Ackerman had the motive to kill. . . [Walker], Both individuals said [Walker] was about to turn either Mr. Ackerman or Mr. Garlock in, because [Walker] had information about either Mr. Garlock or Mr. Ackerman being a wanted individual and also information about these folks' true identity.
>
> In the entire time that we've had this case, we've never been able to find any information about Mr. Garlock using aliases or being wanted. But we know that Mr. Ackerman has lots of aliases and ... at the time was wanted by the U.S. marshals, and he still is today.
>
> One thing that is troubling, I think not only for everyone who has worked on this case but especially for. . . Walker['s mother] is that she doesn't know what happened in the moments of her son's last moments of his life. We know that he was shot six times. We know he had a wound on his hand, a wound that says to us that he wasn't killed right away, that he used his hand to deflect shot.

REPORT AND RECOMMENDATION - 4

> We've not been able to get information about why was [Walker] shot at that particular moment. The only thing that I can shot [Walker] when he was least expecting it, just like he threatened to do to others.
>
> After hearing from Walker's mother, Ackerman's counsel, and Ackerman, the trial court sentenced Ackerman not to the recommended 240 months, but to the maximum term of 295 months. . . .

Dkt. 9-1 at 26-40.

B. <u>Procedural Background</u>

Petitioner appealed from the judgment and sentence to the Washington Court of Appeals. Dkt. 9-1 at 42-67; 69-91; 93-118. The Washington Court of Appeals, Division II, transferred the appeal to Division I for a decision, and Division I affirmed the convictions and sentence. Dkt. 9-1 at 26-40; 42-67. The court remanded the matter for the superior court to correct the judgment and sentence to specify that Petitioner's restitution obligations were joint and several with his codefendant. Dkt. 9-1 at 26-40. Petitioner sought review by the Washington Supreme Court. Dkt. 9-1 at 120-159; 161-176. Petitioner presented the following issues to the Washington Supreme Court:

> The defendant negotiated a plea down from first degree premeditated murder to second degree murder, and the prosecutor agreed to recommend a sentence of 240 months, within the 195 to 295-month standard range. But at sentencing, the prosecutor perfunctorily noted the recommendation, then made extensive unsolicited remarks about motive and plan, emphasized the vulnerability of the victim, opined about lack of remorse, detailed the defendant's criminal past, and in several other ways set out herein, implicitly argued that the crime was as bad as first degree murder, and impliedly catalogued multiple well known statutory aggravating factors, objectively encouraging a harsher sentence – which Mr. Ackerman indeed then received.
>
> Did the State breach the plea agreement, requiring reversal of the 295- month sentence and remand for re-sentencing before a different court, or withdrawal of the plea, at Mr. Ackerman's choice?

Dkt. 9-1 at 120-159.

1  The Washington Supreme Court denied review on June 3, 2020. Dkt. 9-1 at 178. The
2  mandate issued on June 10, 2020. Dkt. 9-1 at 180.

3  On February 11, 2021, Petitioner filed his Petition raising one ground for relief alleging
4  his due process rights were violated based on the prosecutor's comments during sentencing. Dkt.
5  3. On April 15, 2021, Respondent filed, and served on Petitioner, an Answer and Memorandum
6  of Authorities. Dkt. 8, 9. In the Answer, Respondent asserts the state court's adjudication of the
7  sole ground raised in the Petition was not contrary to, or an unreasonable application of, clearly
8  established federal law. Dkt. 8. Petitioner did not file a traverse at that time.

9  However, on June 10, 2021, the Court directed Respondent to file a supplemental state
10 court record that contained the plea agreement, which was not included in the record originally
11 provided to the Court. Dkt. 10. The Court also permitted Respondent to file a supplemental
12 answer to address the supplemental state court record (*Id*. at 2), and further permitted Petitioner
13 to file a supplemental traverse to address only the supplemental record and Respondent's
14 supplemental answer (*Id*. at 3). On June 30, 2021, Respondent complied with the Court's order
15 (Dkt. 11, 12), and July 28, 2021, Petitioner filed a traverse. Dkt. 13.

16 **II.  Discussion**

17 Respondent concedes the Petition is timely and that Petitioner exhausted his state court
18 remedies. Dkt. 8 at 6. Respondent maintains the state courts' adjudication of ground one was not
19 contrary to, nor an unreasonable application of, clearly established federal law. Dkt. 8.

20 A.  <u>Standard of Review</u>

21 Pursuant to 28 U.S.C. § 2254(d)(1), a federal court may not grant habeas relief on the
22 basis of a claim adjudicated on the merits in state court unless the adjudication "resulted in a
23 decision that was contrary to, or involved an unreasonable application of, clearly established
24 Federal law, as determined by the Supreme Court of the United States." In interpreting this

1  portion of the federal habeas rules, the Supreme Court has ruled a state decision is "contrary to"
2  clearly established Supreme Court precedent if the state court either (1) arrives at a conclusion
3  opposite to that reached by the Supreme Court on a question of law, or (2) confronts facts
4  "materially indistinguishable" from relevant Supreme Court precedent and arrives at an opposite
5  result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

6       Moreover, under 28 U.S.C. § 2254(d)(1), "a federal habeas court may not issue the writ
7  simply because that court concludes in its independent judgment that the relevant state-court
8  decision applied clearly established federal law erroneously or incorrectly. Rather, that
9  application must also be unreasonable." *Id*. at 411; *see Lockyer v. Andrade*, 538 U.S. 63, 69
10 (2003). An unreasonable application of Supreme Court precedent occurs "if the state court
11 identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies
12 it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407. In addition, a
13 state court decision involves an unreasonable application of Supreme Court precedent "'if the
14 state court either unreasonably extends a legal principle from [Supreme Court] precedent to a
15 new context where it should not apply or unreasonably refuses to extend that principle to a new
16 context where it should apply.'" *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting
17 *Williams*, 529 U.S. at 407).

18      The Anti-Terrorism Effective Death Penalty Act (AEDPA) requires federal habeas courts
19 to presume the correctness of state courts' factual findings unless applicants rebut this
20 presumption with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Further, review of
21 state court decisions under 28 U.S.C. § 2254(d)(1) is "limited to the record that was before the
22 state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180-81
23 (2011).

24

REPORT AND RECOMMENDATION - 7

B. <u>Plea Agreement Violation</u>

Petitioner argues that his due process rights were violated because the prosecutor's statements during his sentencing hearing breached the plea agreement to recommend a 240-month sentence. Dkt. 3.

1. *Legal Standard*

In general, considerations of fundamental fairness require that "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York,* 404 U.S. 257, 262 (1971); *accord Gunn v. Ignacio,* 263 F.3d 965, 969 (9th Cir. 2001); *United States v. Mondragon,* 228 F.3d 978, 980 (9th Cir. 2000). To determine whether a plea agreement has been breached, courts consider what was "reasonably understood" by a defendant "when he entered his plea of guilty." *Gunn,* 263 F.3d at 970; *United States v. Serrano,* 938 F.2d 1058, 1061 (9th Cir. 1991). "[T]he construction of the plea agreement and the concomitant obligations flowing therefrom are, within broad bounds of reasonableness, matters of state law." *Ricketts v. Adamson,* 483 U.S. 1, 5 n. 3 (1987).

2. *State Court Decision*

On appeal, the Washington Court of Appeals held:

> "A plea agreement is a contract between the State and the defendant." *State v. MacDonald*, 183 Wn.2d 1, 8, 346 P.3d 748 (2015). Accordingly, under ordinary contract principles binding the parties to the agreement, "[t]he State ... has a contractual duty of good faith, requiring that it not undercut the terms of the agreement, either explicitly or implicitly, by conduct evidencing intent to circumvent the terms of the plea agreement." *MacDonald*, 183 Wn.2d at 8. Additionally, because defendants waive significant rights by pleading guilty to a crime, "constitutional due process 'requires a prosecutor to adhere to the terms of the agreement' by recommending the agreed-upon sentence." *MacDonald*, 183 Wn.2d at 8 (quoting *State v. Sledge,* 133 Wn.2d 828, 839, 947 P.2d 1199 (1997)). "Whether a breach of a plea agreement occurred is an issue [we] review de novo." *State v. Neisler*, 191 Wn. App. 259, 265, 361 P.3d 278 (2015).

"We review a prosecutor's actions and comments objectively from the sentencing record as a whole to determine whether the plea agreement was breached." *State v. Carreno-Maldonado*, 135 Wn. App. 77, 83, 143 P.3d 343 (2006). "Although the State need not enthusiastically make the sentencing recommendation, '[it] is obliged to act in good faith, participate in the sentencing proceedings, answer the court's questions candidly in accordance with [the duty of candor towards the tribunal][,] and ... not hold back relevant information regarding the plea agreement." *Carreno-Maldonado*, 135 Wn. App. at 83 (most alterations in original) (quoting *State v. Talley*, 134 Wn.2d 176, 183, 949 P.2d 358 (1998)). "A breach occurs when the State offers unsolicited information by way of report, testimony, or argument that undercuts the State's obligations under the plea agreement." *Carreno-Maldonado*, 135 Wn. App. at 83.

Where, as here, the State agrees to make a midrange sentencing recommendation, "we recognize that it may be necessary to recount certain potentially aggravating facts in order to safeguard against the court imposing a lower sentence." *Carreno-Maldonado*, 135 Wn. App. at 84. That said, "a prosecutor must use great care in such circumstances, and the facts presented must not be of the type that make the crime more egregious than a typical crime of the same class." *Carreno-Maldonado*, 135 Wn. App. at 84-85.

Here, the prosecutor's conduct at sentencing did not amount to a breach of the plea agreement. Specifically, the trial court was not bound by the parties' midrange sentencing recommendation. Thus, the prosecutor's remarks regarding Walker's relative youth, the extreme control that Ackerman exercised in the relationship, Ackerman's concern that Walker would turn him in, and Ackerman's criminal past and attempts to impersonate Walker after his death are fairly characterized as the recounting of facts to support the agreement to a midrange (as opposed to low-end) sentencing recommendation. Furthermore, these facts were consistent with allegations already before the court based on the probable cause affidavit, Walker's offender score calculation, and Walker's sentencing in the identity theft case. By bringing these themes to the court's attention at the sentencing hearing, the prosecutor did not engage in "outright advocacy" or advance aggravating circumstances that had no basis in the record. *Cf. State v. Van Buren*, 101 Wn. App. 206, 215, 2 P.3d 991 (2000) (State breaches plea agreement when it "crosses the line from objectively reporting facts that may have some bearing factors to outright advocacy actors"); *State v. Xaviar*, 117 Wn. App. 196, 201, 69 P.3d 901 (2003). (concluding that breach occurred and observing that prosecutor referenced aggravating circumstances that went beyond those mentioned in presentence report). Finally, and although the prosecutor should not have elaborated as much as she did about Ackerman's threats against Walker's friends and the alleged circumstances of the shooting itself, the facts presented by the prosecutor were not of the type that made Ackerman's crime more egregious than other second degree murders. Rather, when viewed objectively in the context of the sentencing record as a whole, the obvious implication from the prosecutor's

REPORT AND RECOMMENDATION - 9

explanation that "I tell all of that to Your Honor because I know the court is going to be sentencing Mr. Garlock later" is that the State planned to recommend a lower sentence for Garlock despite Ackerman's claim that Garlock was the shooter. It was not inappropriate under these circumstances for the prosecutor to explain why the State believed that Ackerman was the shooter and thus deserving of a higher sentence than Garlock. For these reasons, we conclude that the prosecutor's conduct did not amount to a breach of the plea agreement.

Ackerman disagrees, contending that "there is no need at a sentencing hearing for the trial court to 'distinguish' this defendant from a co-defendant who will later be sentenced." But he cites no authority to support his apparent contention that in a case involving codefendants for whom the State will recommend different sentences, a prosecutor is not permitted to justify the higher recommendation—or that she may do so only in the context of explaining the lower one.

Additionally, the cases on which Ackerman relies to argue that a breach occurred are distinguishable and do not require reversal here. In *Xaviar*, the State and the defendant agreed to a recommendation at the bottom of the standard range. 117 Wn. App. at 198. But at sentencing, the prosecutor emphasized the graveness of the crime, reiterated the charges that the State did not bring, noted that the State could have, but did not, ask for a 60-year exceptional sentence, highlighted aggravating factors that would support an exceptional sentence, and referred to the defendant as "'one of the most prolific child molesters that this office has ever seen.'" *Xaviar*, 117 Wn. App. at 198-201. We held that the prosecutor's conduct constituted a breach of the plea agreement. *Xaviar*, 117 Wn. App. at 198.

In *United States v. Whitney*, the government agreed both to recommend a low-end sentence and to not use any incriminating information divulged by the defendant. 673 F.3d 965, 968 (9th Cir. 2012). But at sentencing, the prosecutor stated that the defendant had "'supplied information to [the prosecutor] during his debriefing session that put himself in a supervisory role.'" *Whitney*, 673 F.3d at 969. She also asserted that the defendant "was a 'good thief,' and pointed to past offenses already included in the record . . . to contend that [he] had 're- victimized' his victims." *Whitney*, 673 F.3d at 971. The Ninth Circuit held that the prosecutor's remarks breached the plea agreement both by recounting the defendant's incriminating statements and by implicitly arguing for a higher sentence than the low-end sentence the government had agreed to recommend. *Whitney*, 673 F.3d at 970-71. The court observed that "when the government obligates itself to make a recommendation at the low end of the . . . range, it may not introduce information that serves no purpose but 'to influence the court to give a higher sentence.'" *Whitney*, 673 F.3d at 971 (quoting *United States v. Johnson*, 187 F.3d 1129, 1135 (9th Cir. 1999)).

In *State v. Williams*, the State agreed to recommend a sentence at the high end of the standard range. 103 Wn. App. 231, 233, 11 P.3d 878 (2000). But in a 16-page sentencing memorandum, the State included a section regarding exceptional

sentences in which it addressed aggravating circumstances. *Williams*, 103 Wn. App. at 236. The State also argued in its sentencing memorandum that a sentence at the high end of the range "'is the MOST leniency that should be afforded to the defendant,'" an argument that the prosecutor echoed at sentencing by advocating for "'*at least* a high-end recommendation.'" *Williams*, 103 Wn. App. at 237, 238. We concluded that by "set[ting] forth specific grounds for imposing an exceptional sentence," the prosecutor's conduct constituted a breach of the plea agreement. *Williams*, 103 Wn. App. at 239.

In both *Van Buren* and *Jerde*, the State agreed to recommend a standard range sentence, while the presentence investigation report (PSI) recommended an exceptional sentence. *Van Buren*, 101 Wn. App. at 209; *Jerde*, 93 Wn. App. 774, 776-77, 970 P.2d 781 (1999). At sentencing in each case, the prosecutor briefly noted the State's recommendation but proceeded to identify aggravating factors that the court could consider in support of an exceptional sentence, including factors that were not contained in the PSI. *Van Buren*, 101 Wn. App. at 215, 217; *Jerde*, 93 Wn. App. at 777-78, 782. In each case, we concluded that the prosecutor's conduct amounted to a breach of the plea agreement, making specific note of the prosecutor's reference to aggravating factors not mentioned in the PSI. *Van Buren*, 101 Wn. App. at 216 (observing that unnecessary highlighting of two aggravating factors proposed in the PSI did not, standing alone, cross the line into advocacy, but that unsolicited reference to an unmentioned factor "was more egregious"); *Jerde*, 93 Wn. App. 782 (observing that "both prosecutors advocated for an exceptional sentence by highlighting aggravating factors and even added an aggravating factor not found in the [PSI]").

Finally, in *Carreno-Maldonado*, the State agreed to make a low-end recommendation on one count of first degree rape, a midpoint recommendation of 240 months on five counts of second degree rape, and a high-end standard range recommendation on a count of second degree assault. *Carreno-Maldonado*, 135 Wn. App. at 79-80. At the sentencing hearing, the court set out the standard range sentence, acknowledged having reviewed the PSI and plea agreements, then asked the State if it had anything to add. *Carreno-Maldonado*, 135 Wn. App. at 80. The prosecutor then made a statement "'on behalf of the victims'" in which the prosecutor referred to the defendant's "'very extreme violent behavior'" and his preying on "'what would normally be considered a vulnerable segment of our community'" in carrying out "'crimes . . . so heinous and so violent [they] showed a complete disregard and disrespect for these women.'" *Carreno-Maldonado*, 135 Wn. App. at 80-81. Only when defense counsel objected and suggested that the State was failing to comply with the plea agreement did the prosecutor respond, "'I'm speaking here on behalf of the victims and on behalf of the [S]tate[.] And I'm not going beyond my recommendation in this case. It's an agreed recommendation. M[y] recommendation [for the second degree rape is] 240 months.'" *Carreno-Maldonado*, 135 Wn. App. at 81 (alterations in original).

REPORT AND RECOMMENDATION - 11

> Here, unlike in *Xaviar* and *Whitney*, where there was an agreed *low-end* recommendation, the parties agreed to a *midrange* recommendation. Thus, as discussed, it was not a breach for the prosecutor to discuss some potentially aggravating facts to support its midrange recommendation and "safeguard against the court imposing a lower sentence." *Carreno-Maldonado*, 135 Wn. App. at 84. And unlike in *Williams*, the State did not repeatedly suggest that the recommended sentence was the minimum the court should impose. Furthermore, unlike in *Van Buren* and *Jerde*, there was no request for an exceptional sentence in a PSI of which the prosecutor took advantage by arguing specific aggravating factors to support an exceptional sentence. And finally, unlike in *Carreno-Maldonado*, where the prosecutor made a statement "on behalf of the victims" and did not even mention the State's recommendation until the defendant objected, the prosecutor here began with the State's recommendation and, as discussed, her remarks were appropriate in the context of justifying that midrange recommendation. Ackerman does not demonstrate that the prosecutor's remarks amounted to a breach of the plea agreement.

Dkt. 9-1 at 38-39.

3. *Analysis*

Petitioner argues that the prosecutor breached the plea agreement by advocating for a harsher, longer, sentence when he described facts surrounding the crime supporting a finding of premeditation and potentially aggravating factors were the case to go to trial. Dkt. 3 at 5. Respondent maintains that Petitioner is not entitled to relief because his claim is not supported by any clearly established federal law. Dkt. 8.

At sentencing, the prosecutor gave his agreed recommendation: 240-months confinement and 36-months community custody. Dkt. 9-1 at 258-266. The prosecutor then provided the judge background information surrounding the circumstances leading up to the murder. The prosecutor stated that the victim was vulnerable, that he met Petitioner on a dating app for gay men when he was still 17-years-old, and during the months preceding the murder had been living a transient lifestyle with Petitioner, who was at least 30-years-old and recently released from an east-coast prison. *Id*. at 260-266. The prosecutor noted that at the time Petitioner was taken into custody he was wanted by the U.S. Marshalls, though he did not explain why. *Id*. at 265. The prosecutor

explained that Petitioner had roped the victim into his identity theft racket and was motived to kill him to prevent disclosure of Petitioner's criminal activity. *Id*. at 261, 265. Finally, the prosecutor told the court that the victim had been shot several times in a manner consistent with Petitioner's threats of death to background witnesses—"just when you least expect it"—and that the victim's body was found in an isolated forest area by a walker. *Id*. at 263, 265.

After the prosecutor completed his remarks, the victim's mother presented a powerful victim impact statement in which she asked for a harsher sentence than the plea agreement recommended. *Id*. at 267-271. Defense counsel then addressed the court on behalf of Petitioner, however she did not object to the prosecutor's recommendation or background information, but simply asked the judge to follow the agreed 240-month recommendation. *Id*. at 272-274. Finally, Petitioner addressed the judge, exercising his right of allocution, and asked for mercy. *Id*. at 274-275.

Explaining his decision to sentence Petitioner to 295 months—the maximum guideline sentence under the circumstances—the judge noted that the parties had agreed to a recommended sentence, but he was deviating to the maximum length of confinement permitted under the circumstances, explaining:

> Preparing for the sentencing today, a word that kept coming to mind in looking at this crime and its core as well as Mr. Akerman's criminal record is a word that Ms. Walker used during her Victim Impact Statement, which is "predator." It's clear that in[] many different ways that Mr. Ackerman had preyed upon others, whether it's identity theft, whether it's the other crimes he's committed previously, and the ultimate crime of murder in this case.
>
> This court here, in looking at this case, has no confidence in the ability of Mr. Ackerman to change in any meaningful way in a meaningfully short period of time. Ms. Walker's son has paid the ultimate price in this case, and so too will Mr. Ackerman in his sentence. I am sentencing him to 295 months in prison, the maximum allowed under the standard range in this crime. The facts, again, of this case are deeply concerning. I am only considering those facts which I may consider. But the mere fact of murder, when combined with the prior crimes that Mr.

REPORT AND RECOMMENDATION - 13

> Ackerman has engaged in, leaves this court deeply troubled about the safety and security of those members of our society at large. For at least the maximum time that I have the power to make sure that you are out of our community and cannot prey upon others, you will not be able to do so. You will be in prison.

*Id*. at 275-276.

The purported breach identified by the Petitioner in this case is significantly different from other habeas cases where actual repudiation of a plea agreement deprived the prisoner of a contractual right to be released. For instance, the prosecutor's statement regarding the background information does not rise to the level of *Santobello* where the prosecutor agreed to make no recommendation as to sentence, but then a subsequent prosecutor on the case (apparently unaware of the prior promise) did make a sentencing recommendation. *See Santobello,* 404 U.S. at 258-259. Here, the prosecutor made exactly the agreed upon recommendation. Dkt. 9-1 at 258. The plea agreement did not (and could not) guarantee Petitioner would receive the 240-month sentence; it only promised the prosecutor would recommend 240-months, which he did. *See e.g*., Dkt. 12-1 at 5, 11-12, 21.

Petitioner fails to explain why the Washington Court of Appeals decision was contrary to, or an unreasonable application of, federal law. The cases cited by the Washington Court of Appeals applied the equivalent standards in *Santobello,* and Petitioner does not identify any other clearly established Supreme Court authority, much less a Supreme Court case holding that a prosecutor's detailed statements at sentencing, made for the purpose of explaining the background of the case, constitutes a violation of a plea agreement where the prosecutor otherwise recommends the agreed upon sentence. *See* Dkt. 9-1 at 264.

Since the Supreme Court has not explicitly held that comments about the facts of a crime during sentencing violate a plea agreement, Petitioner's claim cannot be said to be contrary to, or an unreasonable application of, clearly established federal law. *See Stenson v. Lambert*, 504 F.3d

873, 881 (9th Cir. 2007) ("Where the Supreme Court has not addressed an issue in its holding, a state court adjudication of the issue not addressed by the Supreme Court cannot be contrary to, or an unreasonable application of, clearly established federal law."); *see also Carey v. Musladin*, 549 U.S. 70 (2006)(same).

Therefore, this Court finds Petitioner has not demonstrated that the state court's conclusion was contrary to, or an unreasonable application of, clearly established federal law, and consequently recommends that Petitioner's sole ground for relief be denied.

### III.  Evidentiary Hearing

The decision to hold an evidentiary hearing is committed to the Court's discretion. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Id.* at 474. In determining whether relief is available under 28 U.S.C. § 2254(d)(1), the Court's review is limited to the record before the state court. *Cullen*, 563 U.S. at 181-82. A hearing is not required if the allegations would not entitle Petitioner to relief under §2254(d). *Landrigan*, 550 U.S. at 474. "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id*. The Court finds it is not necessary to hold an evidentiary hearing in this case because the Petition may be resolved on the existing state court record.

### IV.  Certificate of Appealability

A petitioner seeking post-conviction relief under 28 U.S.C. § 2254 may appeal a district court's dismissal of the federal habeas petition only after obtaining a certificate of appealability from a district or circuit judge. *See* 28 U.S.C. § 2253(c). "A certificate of appealability may issue . . . only if the [petitioner] has made a substantial showing of the denial of a constitutional right."

REPORT AND RECOMMENDATION - 15

28 U.S.C. § 2253(c)(2). A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). The Court finds no jurist of reason could disagree with this Court's evaluation of Petitioner's claim, nor would any jurist of reason conclude the issues presented in the Petition should proceed further. Therefore, the Court recommends that a certificate of appealability be denied.

### V. Conclusion

The Court recommends the Petition (Dkt. 3) be denied with prejudice.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of de novo review by the district judge. *See* 28 U.S.C. § 636(b)(1)(C). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed to set the matter for consideration on September 10, 2021, as noted in the caption.

Dated this 26th day of August, 2021.

David W. Christel
United States Magistrate Judge